247 B.R. 383 (1999)
In re Claudio and Mary DeBAGGIS, Debtors.
Frank T. Araps, Plaintiff,
v.
Claudio D. DeBaggis, Defendant.
Bankruptcy No. 96-38315 (RTL). Adversary No. 97-3168.
United States Bankruptcy Court, D. New Jersey.
December 1, 1999.
*384 *385 Richard P. Shapiro, Middle brooks & Shapiro, P.C., Parsippany, NJ, for Plaintiff, Frank T. Araps.
Frank T. Araps, North Brunswick, NJ, Pro Se Co-Counsel for Plaintiff.
Benjamin S. Bucca, Jr., New Brunswick, NJ, for Defendant/Debtor, Claudio D. DeBaggis.

OPINION
RAYMOND T. LYONS, Bankruptcy Judge.
A lawyer, Frank T. Araps, sued his former client, Claudio D. DeBaggis, to recover his costs of defending himself against a claim by Khalil Shaqfeh accusing Araps of mishandling $13,000.00 of Shaqfeh's funds. Ultimately, Araps settled with Shaqfeh for $5,000.00, however, he spent a considerable amount in defense costs in state court and in pursuing DeBaggis in this court. Araps argues that his client defrauded him, there by exposing him to liability to Shaqfeh. Therefore, Araps claims DeBaggis is obligated to reimburse him for the settlement amount and defense costs. He further argues that such obligation is not dischargeable under 11 U.S.C. § 523(a)(2)(A). The court holds that DeBaggis did not defraud his lawyer or any one else. Therefore, Araps' claim is dischargeable. Furthermore, Araps' claims for contribution and indemnification are barred as a matter of law.

JURISDICTION
This court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of the United States District Court for the District of New Jersey dated July 23, 1984 referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) concerning dischargeability of particular debts. This constitutes the court's findings off act and conclusion so flaw as required by FED. R. BANKR. P. 7052.

FACTS
In November 1990, Claudio D. DeBaggis and his partner Jim Pirone obtained a franchise from Triangle Repro Centers Co. of Delaware (the "Franchisor") to operate a retail duplicating and reproduction business. They leased retail space on Route 27 in North Brunswick, New Jersey and formed a new corporation, Triangle Repro Center of North Brunswick, Inc., to operate the business (the "North Brunswick Franchise"). The shareholders in the corporation were Claudio DeBaggis (25%), his wife, Mary DeBaggis, (25%) and Jim Pirone (50%). Pirone invested approximately $65,000.00 in the business while the DeBaggis's put up only $10,000.00. Mr. and Mrs. DeBaggis, however, worked long hours in the start up operation for little or no salary. After about a year, Pirone became disenchanted with the business and wanted to be bought out.
Coincidentally, Khalil Shaqfeh was looking to acquire a Triangle Repro Center franchise. Shaqfeh, an employee of the Franchisor, had been successful in the sales and marketing of reproduction services. He was, also, a close, personal friend of Joseph Teti, the principal of the Franchisor. Shaqfeh became interested in owning his own franchise. Besides working for the Franchisor, Shaqfeh owned a patio furniture business and several residential apartment buildings, so he was an experienced business person. In addition, Shaqfeh is highly educated, having earned a degree in electrical engineering from the University of Chicago and a masters in business administration from the University of Pennsylvania. Through a colleague at the Franchisor, Shaqfeh was introduced to DeBaggis.
*386 Another coincidence was the looming expiration of the first year of the North Brunswick Franchise and a dispute with Joseph Teti, the principal of the Franchisor, overpayment of the $20,000.00 balance of the franchise fee. Attorney Araps, who had been a customer of the North Brunswick Franchise, learned of the dispute from DeBaggis. On Sunday, March 8, 1992 DeBaggis met with Araps to discuss the renewal of the North Brunswick Franchise. DeBaggis told Araps that the Franchisor was pushing for payment of the balance of the franchise fee. DeBaggis had depleted his savings and Pirone, who had already invested over $50,000.00 and wanted to get out of the business, refused to contribute any more. DeBaggis told Araps he planned a phased purchase of Pirone's interest and had a prospective new partner, Shaqfeh, who would put up some money. Araps agreed to represent DeBaggis in resolving his differences with the Franchisor. The first order of business was for Araps to draft a response to the Franchisor. At a later time he would draft a promissory note for a loan from Shaqfeh to the North Brunswick Franchise.
A series of discussions between DeBaggis and Shaqfeh lead to an oral agreement for Shaqfeh to acquire a 50% interest in the North Brunswick Franchise.[1] According to DeBaggis, the price was $55,000.00 with $15,000.00 up front and $20,000.00 in cash over two years. After the initial investment, Shaqfeh was to begin working in sales and marketing of reproduction services for the North Brunswick Franchise (as he had done for the Franchisor). The balance of $20,000.00 for the half interest in the North Brunswick Franchise would be earned by Shaqfeh's foregoing compensation for his services. Stock in the corporation would be issued to Shaqfeh on a pro rata basis as he paid cash and earned compensation.
Meanwhile, Araps had success fully negotiated resolution of all issues with the Franchisor including a promise by DeBaggis to pay the $20,000.00 balance of the franchise fee by April 1, 1992. Also, DeBaggis and Pirone came to an agreement for the corporation to redeem Pirone's investment by monthly payments overtime. Thus, if all contemplated transactions would have been completed, Shaqfeh would own half the North Brunswick Franchise and Mr. and Mrs. DeBaggis would own the other half. Jim Pirone would have been bought out.
The time came for Shaqfeh to put up his $15,000.00 down payment, but he claimed he could only raise $13,000.00 and would pay the additional $2,000.00 in a month.[2] In mid-March 1992, DeBaggis and Shaqfeh spoke to Araps (the "Conference Call") about Shaqfeh's investment in the North Brunswick Franchise and the fact that the $20,000.00 balance of the franchise fee was due to the Franchisor by April 1, 1992. Araps suggested that Shaqfeh's money, together with $7,000.00 raised by DeBaggis from other sources, be deposited into Araps' trust account and then paid over to the Franchisor to preserve the North Brunswick Franchise. Araps specifically informed Shaqfeh that the money would be *387 immediately paid over to the Franchisor.[3] The parties expected Araps to draw up documents to reflect Shaqfeh's involvement with the North Brunswick Franchise, but Araps was looking for more details before he could begin drafting documents. Araps, also, advised Shaqfeh to get his own lawyer since Araps could only represent one party, DeBaggis, in the transaction.
On March 26, 1992 Shaqfeh and DeBaggis had an appointment to meet at Araps' office so that Shaqfeh could give his down payment to Araps. When they arrived, Araps was not there; he was in court trying a case. Araps called his office and asked his office-mate to accept the check from Shaqfeh, which was done. Shaqfeh's $13,000.00 was deposited into Araps' trust account together with $7,000.00 DeBaggis borrowed from his mother-in-law. After the deposit cleared, Araps for warded a check for $20,000.00 to the Franchisor, in payment of the balance of the franchise fee.
The transaction with Shaqfeh was never fully consummated. Shaqfeh began selling reproduction services for the North Brunswick Franchise but after two or three week she stopped working. Efforts by the DeBaggis's to get Shaqfeh back to work were unavailing. Shaqfeh was a "no show". Needless to say, Shaqfeh also failed to pay any more to wards the purchase price of a half interest in the North Brunswick Franchise. The DeBaggis's concluded that Shaqfeh was focusing on his other business or personal affairs and lost interest in the North Brunswick Franchise. Neither DeBaggis nor Araps heard from Shaqfeh for several months.
Almost a year later, by letter dated February 4, 1993, Shaqfeh's lawyer wrote to Araps and demanded that Araps refund the $13,000.00 from his trust account. Understandably, Araps was outraged by the demand since he was certain Shaqfeh understood that his money would be turned over to the Franchisor by April 1, 1992. Araps was also concerned, as well he should have been, that Shaqfeh's lawyer alleged a mishandling of trust funds: a serious, potentially career-ending offense for a lawyer. Araps disclaimed any liability to Shaqfeh and simultaneously tried to convince DeBaggis to refund the $13,000.00 to Shaqfeh. Araps' motive in this regard is clear. If he could convince DeBaggis to pay $13,000.00 to Shaqfeh, Shaqfeh would no longer pursue his claim that Araps mishandled funds in his trust account. DeBaggis, likewise, disclaimed any liability and refused Araps' entreaties that here fund money to Shaqfeh. DeBaggis maintained that Shaqfeh had defaulted on his agreement to purchase half the business and therefore the $13,000.00 was non-refundable.
A second year elapsed before Shaqfeh instituted suit in New Jersey state court on March 24, 1994 against Araps and DeBaggis for recovery of the $13,000.00. Araps cross-claimed against DeBaggis for contribution and indemnification. After spending substantial funds on defense costs, Araps settled with Shaqfeh for $5,000.00.[4]
*388 Mr. and Mrs. DeBaggis filed a voluntary petition under chapter 7 of the Bankruptcy Code on September 24, 1996 thus staying the state court action against Mr. DeBaggis. 11 U.S.C. § 362(a). Both Shaqfeh and Araps commenced adversary proceedings in this court objecting to the dischargeability of their claims against DeBaggis on the basis of fraud under 11 U.S.C. § 523(a)(2)(A). The adversary proceedings were consolidated. On the first day of trial in bankruptcy court, DeBaggis settled with Shaqfeh, leaving only Araps' complaint against DeBaggis that his claim for contribution and indemnification should be nondischargeable. Araps seek store cover not only the $5,000.00 he spent to settle with Shaqfeh, but also his attorney's fees and costs of defending himself against Shaqfeh in the state court ($22,556.62)[5] and his attorney's fees and costs of pursuing his adversary proceeding against DeBaggis in the bankruptcy court ($18,768.12).
Araps' complaint alleges that DeBaggis misrepresented that the "would (i) provide the terms of an employment agreement and stock sale between himself and Shaqfeh to Araps in writing so that Araps could prepare the documentation; or (ii) provide a Promissory Note to Shaqfeh; or (iii) reach agreement with Shaqfeh as to a combination of the above as soon as a decision is reached as to which option (DeBaggis) and Shaqfeh would pursue." Araps claims that he was defrauded because DeBaggis never intended to reach agreement with Shaqfeh. Furthermore, Araps contends that had he known DeBaggis considered the deposit nonrefundable, he would never have released it. Lastly, Araps maintains that had he known DeBaggis did not consider him to be his lawyer, he would never have released the money.

CONCLUSIONS OF LAW
A. Fraud
"The overriding purpose of the Bankruptcy Code `is to relieve debtors from the weight of oppressive indebtedness and provide them with afresh start.'" Starr v. Reynolds (In re Reynolds), 193 B.R. 195, 200 (D.N.J.1996) (quoting Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir.1995)). Accordingly, exceptions to discharge are to be narrowly construed. A countervailing policy is that debts incurred through fraud should not be discharged. The discharge is reserved for the honest but unfortunate debtor. Grogan v. Garner, 498 U.S. 279, 286-287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." Cohen v. De La Cruz (In re Cohen), 106 F.3d 52, 59 (3d Cir.1997), aff'd 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). This countervailing policy is codified in § 523(a)(2)(A) of the Bankruptcy Code which provides:
A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud. . . .
This fraud exception to discharge has been part of the bankruptcy law of the United States since 1898. Cohen v. De La Cruz, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), Field v. Mans, 516 U.S. 59, 64-66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Since Congress has not provided a separate definition, fraud has the *389 same meaning in the Bankruptcy Code as in the common law of torts. Id. at 69-70, 116 S.Ct. 437.
The operative terms in § 523(a)(2)(A), on the other hand, "false pretenses, a false representation, or actual fraud," carry the acquired meaning of terms of art. They are common-law terms, and, as we will shortly see in the case of "actual fraud," which concerns us here, they imply elements that the common law has defined them to include. . . .
It is . . . well established that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to in corporate the established meaning of these terms." . . .
[W]e will look to the concept of "actual fraud" as it was under stood in 1978 when that language was added to § 523(a)(2)(A). Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act.
Id. (citations omitted).
Following the Court's guidance, one should look to the Restatement for the meaning of fraud. The Restatement (Second) of Torts, § 525, sets forth the law regarding liability for fraudulent misrepresentation.
One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.[6]
As the Supreme Court pointed out, "courts that have previously construed this statute, routinely requir[e] intent, reliance, and materiality before applying § 523(a)(2)(A)." Field v. Mans, 516 U.S. at 68, 116 S.Ct. 437. Thus, for a debt to be nondischargeable under § 523(a)(2)(A) the creditor must prove that:
(1) the debtor represented a fact, opinion, intention or law;
(2) the representation was false;
(3) the representation was material;
(4) the debtor obtained money, property or services through the misrepresentation;
(5) the debtor knew at the time that the statement was false (or was made with reckless disregard for its truth);
(6) the debtor intended the creditor to rely on the statement;
(7) the creditor actually relied on the statement;
(8) the reliance was justified;
(9) the creditor sustained damage; and
(10) the damages were the proximate result of the false representation.
De La Cruz v. Cohen (In re Cohen), 191 B.R. 599, 604 (D.N.J.1996), aff'd sub nom. 106 F.3d 52 (3d Cir.1997), aff'd 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). AT&T Universal Card Servs. Corp. v. Wong (In re Wong), 207 B.R. 822, 826 (Bankr.E.D.Pa.1997). The plaintiff bears the burden of proving the objection to discharge. FED. R. BANKR. P. 4005. Each element of the objection must be proved by a preponderance of the evidence. Grogan v. Garner, 498 U.S. at 287-88, 111 S.Ct. 654; Starr v. Reynolds (In re Reynolds), 197 B.R. 204, 205 (Bankr.D.N.J.1996).
*390 To determine if plaintiff has me this burden of proof, the court will focus on the precise allegations of Araps' complaint. The first allegations of fraud relate to statements allegedly made by DeBaggis during the Conference Call in mid-March of 1992. In his complaint, Araps alleges:
27. During the Conference Call, Defendant represented to Araps that Defendant would provide, in writing, the terms of the employment agreement and stock sale when the terms were agreed to by the parties.
28. Defendant also represented to Araps that in the event that terms were not reached, Defendant would provide a Promissory Note to Shaqfeh for the initial payment. . . .
30. Based on the representations of Defendant, Araps advised Shaqfeh that the initial payment toward Shaqfeh's purchase would not be held in escrow, that Araps would only serve as temporary custodian and that the initial payment would be used as partial payment to Teti toward the Franchise Amount. . . .
35. Prior to disbursal of the funds, Defendant again represented to Araps that Defendant would (i) provide the terms of an employment agreement and stock sale between himself and Shaqfeh to Araps in writing so that Araps could prepare the documents; or (ii) provide a Promissory Note to Shaqfeh; or (iii) reach agreement with Shaqfeh as to a combination of the above as soon as a decision is reached as to which option Defendant and Shaqfeh would proceed with.[7]
36. Based upon these representations by Defendant, Araps disbursed to Teti the initial $13,000.00 along with $7,000.00 obtained by Defendant from another individual and $775.00 from Triangle. . . .
39. Defendant made the statements more fully described above, knowing them to be false or with a reckless disregard as to whether they were true or false. . . .
54. Araps' damages were a direct and proximate result of the above described false statements by Defendant in that had Araps known that Defendant would not be providing, in writing, the terms of the employment agreement and stock sale, Araps would not have released the funds to Teti. . . .
57. Araps' damages were a direct and proximate result of the above described false statements by Defendant in that had Araps known that Defendant would not be providing a Promissory Note to Shaqfeh, Araps would not have released the funds to Teti.
The first alleged misrepresentation was that DeBaggis promised to provide a written outline of the terms of agreement between him and Shaqfeh. This was a promise to do something in the future. The fact that DeBaggis never provided a written outline of the terms of his deal does not, necessarily, mean that he did not intend to do as he promised. This statement of intention would have been fraudulent only if DeBaggis, in fact, had no intention of fulfilling his promise. In this case, Shaqfeh became a "no show" and defaulted on his obligations under the agreement with DeBaggis. It is entirely understandable that DeBaggis would not submit an outline of a deal to Araps if it had be come apparent that Shaqfeh would not perform. Thus, even if this statement had been made, it was not false.
The second alleged misrepresentation was that DeBaggis would provide a promissory note to Shaqfeh if they were unable to finalize the terms of their deal. Again, this is a promise to do something in the future. Subsequent events suggest that if the parties ever contemplated a loan by Shaqfeh, they abandoned that concept. Three witnesses, Mary DeBaggis, Claudio *391 DeBaggis and Shaqfeh, all testified that they reached agreement on Shaqfeh acquiring a half interest in the North Brunswick Franchise. The legend handwritten by Shaqfeh on his $13,000.00 check reads: "For partnership in Triangle Reproof North Brunswick." None of the principals considered Shaqfeh's money a loan. The only question is, was Shaqfeh's money to be held in escrow until documents were drafted by Araps and signed by the parties, or was it to be disbursed to the Franchisor immediately? The court has accepted Araps' testimony, corroborated by DeBaggis, that the money was not to be held in escrow, but was to be disbursed immediately to assure renewal of the franchise. No facts have been presented which would lead to a conclusion that DeBaggis fraudulently represented that he would give Shaqfeh a promissory note.
Clearly, a year later in March of 1993, Araps suggested that DeBaggis should give Shaqfeh a note for the $13,000.00. His motive for that was obvious. If DeBaggis would repay Shaqfeh, the heat would be off Araps for having allegedly mishandled trust funds. DeBaggis, on the other hand, refused to consider refunding Shaqfeh's money. As far as DeBaggis was concerned, Shaqfeh walked away from the deal and was not entitled to his money back. So, even if Araps is correct and there was a discussion about a promissory note to Shaqfeh, events changed which lead DeBaggis to conclude that no money was due Shaqfeh. If DeBaggis was mistaken as to his obligation to refund Shaqfeh's money, at most he was liable on a breach of contract, not fraud.
The third alleged misrepresentation in the Conference Call was that DeBaggis would reach agreement with Shaqfeh on a combination of employment agreement, stockholders agreement and promissory note. Once again this was a promise to do something in the future. There is nothing to suggest that DeBaggis did not intend to conclude a transaction with Shaqfeh. As long a DeBaggis intended to proceed with Shaqfeh, as the court find she did, there could have been no misrepresentation even though the deal was not consummated through no fault of DeBaggis.
A debtor is unlikely to admit that he intended to deceive another. Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1118-19 (3d Cir.1995). Consequently, fraudulent intent may be inferred from the debtor's conduct and other surrounding circumstances. Id. at 1118. See also In re Reynolds, 193 B.R. at 200-01. In this case, the circumstances support DeBaggis' position that he intended for Shaqfeh to be a 50% owner of the North Brunswick Franchise. DeBaggis' other partner, Pirone, left the business and monthly payments were made to redeem Pirone's investment in the business. Mr. and Mrs. DeBaggis both continued to work night and day in the business which experienced growth in its first few years of operation. Shaqfeh's $13,000.00 was paid to the Franchisor to preserve the franchise, not diverted to some other purpose. Although Shaqfeh's recitation of the facts differs dramatically from DeBaggis', as well as Araps', Shaqfeh does admit that the made sales calls for a few weeks and then stopped. Considering the testimony of all witnesses and observing their demeanor, as well as reviewing the documentary evidence, including deposition transcripts, the court accepts DeBaggis' account that the deal never went forward because Shaqfeh failed to honor his part of the bargain. Stated another way, DeBaggis did not misrepresent his intent to consummate a deal with Shaqfeh at the time Shaqfeh put his $13,000.00 into Araps' trust account. This is the principal misrepresentation alleged by Araps and a finding that the allegation is false defeats Araps' complaint in this regard.
Araps' complaint, curiously, alleges that DeBaggis made certain false statements a this deposition in April of 1996, four years after disbursement of Shaqfeh's $13,000.00 and after Shaqfeh had started suit in the state court. Araps contends *392 that, some how, these false statements exposed him to liability to Shaqfeh for the $13,000.00. Specifically, Araps' complaint alleges:
49. Defendant, in his April 24, 1996 deposition, stated that Araps was not representing Defendant in the transaction with Shaqfeh. That statement was false.
50. Defendant, in his April 24, 1996 deposition, stated that the $13,000.00 amount was considered by Defendant to be nonrefundable. That statement was false.
51. Based upon Defendant's willful actions[8] and false statements, Plaintiff was damaged.
52. As a direct and proximate result of Defendant's false statements, Araps released the $13,000.00 to Teti. As a result, Araps was subjected to a lawsuit by Shaqfeh causing Araps damages in attorneys' fees, costs and settlement fees to Shaqfeh.
53. Araps' damages were a direct and proximate result of the above described false statements made by Defendant in that had Araps known that Defendant considered the $13,000.00 to be nonrefundable, Araps would not have released the funds to Teti. . . .
55. Araps' damages were a direct and proximate result of the above described false statements by Defendant in that had Araps known that Defendant did not consider Araps to be his attorney in the transaction, Araps would not have released the funds to Teti.
56. Araps' damages were a direct and proximate result of the above described false statements by Defendant in that had Araps known that Defendant considered the initial deposit to be non-refundable, Araps would not have released the funds to Teti.
The short answer to this part of Araps' complaint is, it would be impossible for Araps to rely upon a misrepresentation made in 1996 as an inducement for action taken by him in 1992. Never the less, taking these allegations seriatim, first is the statement that Araps was not DeBaggis' lawyer. DeBaggis was incorrect. Araps was representing him both regarding the franchise renewal and in the discussions with Shaqfeh. Araps, however, was not mislead by DeBaggis. To the contrary, Araps understood the true state of affairs all along. So even though DeBaggis was mistaken when he said a this deposition that Araps was no this lawyer, Araps did not rely on that misstatement and it had no causal connection to Araps' payment of Shaqfeh's $13,000.00. The fact that DeBaggis may have been mistaken about Araps' status as his lawyer, whether at the time of the depositor later, could not have constituted a fraud on Araps. Even if DeBaggis intentionally lied in the state court case by denying Araps was his lawyer, DeBaggis did not "obtain" money, creditor services by means of such false statement; thus, the claim by Araps is dischargeable. See Field v. Mans, 516 U.S. at 78-79, 116 S.Ct. 437 (Ginsburg, J., concurring). The disbursal of money by Araps occurred long before DeBaggis ever denied that Araps was his lawyer and could not have been "obtained" by the alleged fraud. Nevertheless, the court finds that DeBaggis did not intentionally make a false representation that Araps was not his lawyer. Any statement by DeBaggis to that effect was an innocent mistake on his part.
The second alleged misrepresentation in DeBaggis' 1996 deposition was that he considered Shaqfeh's deposit nonrefundable. *393 The court finds as a fact that this statement was true. A true statement can not be the basis for nondischargeability under § 523(a)(2)(A).
B. Contribution
DeBaggis settled with Shaqfeh just prior to the start of trial. As a result, DeBaggis argues that Araps no longer has a cause of action for contribution against him under New Jersey law citing Tefft v. Tefft, 192 N.J.Super. 561, 471 A.2d 790 (App.Div.1983). Since this legal issue was raised for the first time as trial was about to commence, the court decided to proceed with trial and give Araps an opportunity to brief this issue. Araps has failed to cite any authority contrary to Tefft and has not attempted to distinguish the circumstances of this case from Tefft. In light of the finding that DeBaggis has not defrauded Araps, it is unnecessary to reach this issue. Never the less, it appears that DeBaggis is correct that once he settled with Shaqfeh he was no longer exposed for contribution to Araps. Indeed, Tefft holds where both defendants settled with the plaintiff (as happened here), claims for contribution under the Joint Tort feasors Contribution Act, N.J.S. 2A:53A-1, et seq., were extinguished.
The court stated:
[T]he right to contribution accrues only on payment by a joint tort feasor of a money judgment recovered against him on a judgment for the injuries he occasioned. Payment of more than a pro rata share entitles him to restitution under the statute, except as to a settling tort feasor. Moreover, the [New Jersey Supreme C]ourt implied in Greyhound that contribution was not intended when all tort feasors settle. . . . [S]ettlement by all tort feasors bars an action for contribution because there can no longer bean adversary verdict. . . . The policy of our law is that a settling party is released from further responsibility.
Id. at 567-69, 471 A.2d 790. (emphasis added)
The New Jersey Supreme Court has cited Tefft with approval and adopted its holding. In Young v. Latta, 123 N.J. 584, 589 A.2d 1020 (1991) the court wrote:
[A] settling tort feasor shall have no further liability to any party beyond that provided in the terms of the settlement. . . . The Appellate Division has explained that the court should dismiss a non-settler's cross-claim for contribution as a matter of law as a result of the settlement. . . .
Id. at 591, 589 A.2d 1020. A federal court applying New Jersey law follows the same rules regarding contribution. Carter v. Univ. of Med. and Dentistry of N.J., 854 F.Supp. 310 (D.N.J.1994).
Thus, it appears that DeBaggis is correct. Under New Jersey law, once he settled with Shaqfeh he is released from further responsibility to Araps by way of contribution.
C. Indemnity
Since contribution is not available and there is no contract of indemnity, the only other theory Araps may recover on is implied indemnity. Having found no fraud, it is unnecessary to reach the issue of indemnification. If, however, as a matter of law, Araps is not entitled to indemnification, there is another reason to award judgment to DeBaggis.
"[T]he right of indemnity is granted only to those whose liability is secondary and not primary, i.e., whose [conduct] is not morally culpable but is merely constructive, technical, imputed or vicarious." Hut v. Antonio, 95 N.J.Super. 62, 69, 229 A.2d 823, 827 (Law Div.1967) (quoting Public Serv. Elec. & Gas Co. v. Waldroup, 38 N.J.Super. 419, 432, 119 A.2d 172, 179 (App.Div.1995))(internal quotation marks omitted).
It would violate this policy to allow the primary wrong doer to bring an action for indemnification against another party. *394 His only remedy, in the absence of a contract of indemnity, is for contribution  a remedy to tally different from that of indemnification. These remedies are mutually exclusive because one primarily liable is denied the right of indemnification and, under the Joint Tort feasors Contribution Act, one only `constructively' or `vicariously' liable may not be held for contribution. . . .
Id. at 70, 229 A.2d 823.
The New Jersey Supreme Court has stated, "[t]o been titled to indemnification as one who is secondarily or vicariously liable, a party must be without fault." Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 191, 510 A.2d 1152, 1159 (1986). In the seminal case of Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80, 159 A.2d 97, 110 (1960) the supreme court, quoted from Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368 (1951):
The important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defector remedy a dangerous condition caused by the act of the one primarily responsible.
DeBaggis argues that Araps may not seek indemnity because he was at fault. According to DeBaggis, Araps was negligent in not confirming in writing that Shaqfeh's $13,000.00 would be paid over immediately to the Franchisor. This negligence needlessly exposed both DeBaggis and Araps to a suit by Shaqfeh for refund of the money, says DeBaggis. This argument misplaces the focus on Araps' actions. Rather than looking at what Araps may have done to DeBaggis, one should focus on Araps' alleged wrongdoing to Shaqfeh. If Araps would be primarily liable to Shaqfeh, as contrasted with secondary, vicarious or constructive liability, then Araps cannot seek indemnity from DeBaggis. In this case, Shaqfeh alleged that Araps breached a duty to hold his funds in escrow. That liability, if proven, would have been primary, not secondary, vicarious or constructive. Thus, Araps is not entitled to indemnity from DeBaggis.
"Ordinarily, a party who is at fault may not obtain indemnification for its own acts. As an exception to the general rule, one who in good faith and at the direction of another commits a tort is allowed indemnity against the person who caused him to act." Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. at 190, 510 A.2d at 1158-59. (citations omitted). Araps does not come with in this exception because he was not acting at the direction of DeBaggis when he disbursed Shaqfeh's $13,000.00. If one accepts Araps' recollection of the facts, he acted with the express authorization of Shaqfeh. The only way Araps could be liable to Shaqfeh is if one disbelieves Araps. In such case, Araps' liability would be primary and he would not be entitled to indemnification by DeBaggis.

CONCLUSION
The foregoing demonstrates that Araps has not me this burden of proving by a preponderance of the evidence that DeBaggis made any fraudulent misrepresentations. Thus, DeBaggis is entitled to a judgment that his obligations to Araps are dischargeable. In addition, Araps' claim for contribution is barred because DeBaggis settled with Shaqfeh; and Araps is not entitled to indemnification because his liability, if any, was not secondary, vicarious or constructive.
NOTES
[1] Testimony concerning the events between the fall of 1991 and the spring of 1992 was hopelessly in conflict. For example, Shaqfeh and Araps both testified about a March 1992 conference call with DeBaggis; however, their recollection of the discussions were diametrically opposed. DeBaggis, on the other hand, denied that the call ever occurred. Since none of the dealings was reduced to writing, the court had to discern the true facts from the conflicting testimony based upon the credibility of the witnesses and their demeanor, as well as common sense and experience. For the most part, the court believes Araps' recollection of crucial events which, as will be seen, leads the court to find that Shaqfeh was not defrauded by either Araps or DeBaggis and, consequently, Araps was not defrauded by DeBaggis.
[2] Shaqfeh testified that $13,000.00 was the entire purchase price for a half interest in the North Brunswick Franchise. The court does not accept his recollection of the details of the agreement.
[3] Likewise, Mr. and Mrs. DeBaggis both testified that Shaqfeh knew his money was to be paid over to the Franchisor. Shaqfeh claimed he knew nothing about paying the balance of the franchise fee and that Araps should have held his money in escrow pending execution of a shareholder agreement. It is hard to believe that Shaqfeh knew nothing about the due date for the franchise fee in light of his sophistication and experience in working for the Franchisor, to say nothing of his close, personal friend ship with the owner of the Franchisor, Joseph Teti. The court accepts Araps' testimony that Shaqfeh knew his $13,000.00 would be paid out immediately to the Franchisor. In retrospect, Araps should have confirmed in writing to Shaqfeh that his money was to be paid to the Franchisor immediately. Hind sight is 20/20.
[4] Araps claims that judgment was entered in his favor against DeBaggis on his cross claims for contribution and indemnification. Despite submitting hundreds of pages of exhibits into evidence, Araps did not provide a copy of any state court judgment against DeBaggis. Attached to Araps' proposed findings of fact was an unsigned copy of a form of order striking DeBaggis' answer and awarding judgment to Araps on his counter claim, but it does not appear that this order was ever entered by the state court.
[5] In his pretrial memorandum, Araps specifies his costs of defense in the state court action as $4,318.32. At trial Araps introduced accounting records for time spent by himself and attorneys in his firm together with other costs which significantly inflated his damage claim.
[6] Another section of the Restatement (Second) of Torts which may be applicable to the facts of this case is § 557 which reads:

Fraudulent Misrepresentations Inducing Unlawful Acts or Omissions
One who by fraudulent misrepresentations induces another to do an act that would be lawful if there presentation were true but which is in fact unlawful is liable to the other for the loss that he incurs in consequence of the unlawfulness of the act thus induced.
[7] DeBaggis denies making any of these alleged representations. The court assumes for the purposes of this opinion that Araps' recollection is correct.
[8] The complaint mentions only § 523(a)(2)(A)-the fraud exception to discharge. In his pretrial memorandum, Araps accused DeBaggis of willful and malicious fraud and cited § 523(a)(6) as the basis of nondischargeability. At trial, the court specifically inquired of counsel for Araps which subsection of 523 he was proceeding under. Counsel confirmed that Araps was relying solely on § 523(a)(2)(A) and was alleging fraud.