**In re Peter J. CASINI, Debtor.**

**Peter J. Casini, Debtor/Plaintiff,**

**v.**

**Timothy Graustein, Defendant.**

**Bankruptcy No. 97–39420 RTL. Adversary No. 01–5611.**

United States Bankruptcy Court, D. New Jersey.

March 31, 2004.

Karl E. Meyer, Harbor City, NJ, for Debtor/Plaintiff.

Joseph M. Garemore, Mount Laurel, NJ, Stephanie Nolan Deviney, Brown & Connery, LLP, Westmont, NJ, for Defendant.

## OPINION

RAYMOND T. LYONS, Bankruptcy Judge.

This is an adversary proceeding to determine dischargeability of a debt. Plaintiff, Peter J. Casini, filed a voluntary peti-

tion under chapter 7 of the Bankruptcy Code on August 19, 1997 and received a discharge on December 22, 1997. A final decree was entered and the case was closed on November 24, 1998. The case was reopened. Casini initiated this adversary proceeding on December 21, 2001 by filing a complaint to determine dischargeability. This court has jurisdiction under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the order of the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding that may be heard and determined by a bankruptcy judge under 28 U.S.C. § 157(b)(1) and (2)(I) to determine dischargeability of a particular debt.

Casini denies any liability to Graustein. Alternatively, Casini asserts that any liability he may have to Graustein arose before his bankruptcy petition was filed on August 19, 1997 and was discharged. Defendant, Timothy Graustein, avers that his claim was not discharged under 11 U.S.C. § 523(a)(3) because he was not listed or scheduled in Casini's bankruptcy schedules and his debt was the result of fraud, defalcation while acting in a fiduciary capacity, or wilful and malicious injury under 11 U.S.C. § 523(a)(2),(4) or (6). Furthermore, Graustein maintains that his debt arose post petition and was not discharged.

### FACTS

Peter Casini has been around boats his whole life. He is now 44 years old. In 1991, Casini started a business designing, manufacturing and selling power boats under the Cobra trade name. He utilized a catamaran hull design with kevlar and fiberglass which gave the Cobra boats unique qualities. Although his boats achieved some racing success and his fishing boats were featured with glowing praise in boating publications, his businesses all failed. Casini was the design talent behind several entities all of which are now defunct. He ended up in personal bankruptcy in 1997 and later filed an unsuccessful chapter 13 case. He has a foreclosure judgment against his residence and is behind in child support and taxes. He has relied on the generosity of family and friends for survival.

Timothy Graustein purchased a 30 foot Cobra Terminator power boat from Meucke's Marine in Texas in the summer of 1995. The hull of the boat had been manufactured by Cobra but the motors and other accessories were supplied by the dealer. Within a few weeks of acquiring the boat, Graustein had an accident severely damaging the boat. He entered into a written contract in September 1995 with Marine Investors, Inc.[1] of Lower Bank, New Jersey for repair of the boat. The total price for the work was $16,900 payable in installments of $8,450 on contract, $4,225 at "beginning of rigging" and $4,225 on completion. Graustein paid the deposit and arranged to ship the hull from Texas to New Jersey. Later, after being advised that the boat was ready for the motors and mechanicals, Graustein paid the second installment and shipped the motors, etc., to New Jersey.

The parties dispute what happened after the motors, etc. were shipped to New Jersey. Graustein says he inquired about the progress of the work and got the runaround from Marine Investors. Casini says the motors were too large for the boat and

---

1. Marine Investors, Inc.'s letterhead touted itself as the "Builder of 'Cobra' World Champion Power Boats." Craig R. Smith was President of Marine Investors, Inc. and a shareholder. Peter Casini was a vice-president and also a shareholder. Smith negotiated the contract with Graustein and signed it as President.

represented a safety hazard, so Marine Investors refused to install them. This factual dispute need not be resolved here since Graustein sued Marine Investors, Inc., in Texas and got a default judgment. For purposes of the adversary proceeding it may be assumed that Marine Investors, Inc. breached the contract with Graustein.[2] That breach occurred, at the latest, in the first half of 1996.

As mentioned, Graustein sued Marine Investors, Inc. in Texas state court by complaint filed on August 25, 1997, nearly 2 years after the repair contract. After judgment by default, Graustein domesticated the Texas judgment against Marine Investors, Inc. in New Jersey on December 23, 1998 (16 months later) for $265,615.72 plus costs of $215.00. Graustein then subpoenaed Casini for a deposition to discover if Marine Investors, Inc. had assets to satisfy the judgment. At his deposition on July 21, 1999, Casini testified that Marine Investors, Inc. had ceased doing business, that it never made a profit, that it had numerous warranty claims and judgments, and that its only assets were some obsolete molds which were available.[3]

Following this, Graustein retreated to Texas and filed a second amended complaint in Texas state court on August 25, 1999 naming Casini and others as additional defendants. The second amended complaint alleged breach of warranty, negligence and breach of contract. Furthermore, Casini and the other defendants were alleged to be alter egos of one another "and for purpose of liability they are one and the same."

Once again a default judgment was entered on July 20, 2000 in Texas state court and domesticated in New Jersey state court on December 27, 2000, more than five years after the boat repair contract. Another year passed before this adversary proceeding was commenced. In the meantime, Graustein retrieved his boat in September 2000.

Peter Casini has been associated with a number of failed business ventures, including the following:

Cobra Marine Industries, Inc.—incorporated in New Jersey on December 3, 1992—this was Casini's original entry into the business of designing, manufacturing and selling Cobra power boats. Peter Casini was the only principal of this corporation which faded out of business in 1995.

Marine Investors, Inc.—incorporated in New Jersey on May 4, 1995. Craig K. Smith (President) and Peter Casini (Vice President) were the principal shareholders. This company seems to have been the successor to Cobra Marine Industries, Inc.—its letterhead proclaimed Marine Investors, Inc. as "Builder of 'Cobra' World Champion Power Boats". This company had the written boat repair contract with Graustein dated September 11, 1995. It became defunct in 1997 when Smith left and moved to Flor-

---

**2.** The court in Texas awarded Graustein a judgment by default for damages of $175,000 and attorney's fees of $75,000 for a total of $250,000. At trial in the adversary proceeding, Graustein tried to justify such large damages from a $16,900 repair contract, but came woefully short. Nevertheless, this court will assume the Texas judgment is valid and not attempt to recompute damages.

**3.** At trial Graustein offered Casini's deposition transcript in evidence, particularly the portions dealing with Marine Investors' financial condition. The court accepts this evidence as accurate and finds as a fact that Marine Investors, Inc. was insolvent on July 21, 1999. Furthermore, Marine Investors, Inc. filed petitions under chapter 7 on August 18, 1999 and December 14, 1999, both of which were later dismissed.

ida. Subsequently, Marine Investors, Inc. filed for bankruptcy in 1999.

Cobra Sport Fishing Boats, Inc.—incorporated in New Jersey on May 15, 1997—this company controlled by Casini, designed and built fishing boats, whereas the prior companies did racing and pleasure boats. In June 2000, Cobra Sport Fishing Boats, Inc. shut its doors. It filed for bankruptcy on April 24, 2001.

Cobra World Champion Power Boat Corp.—incorporated in New Jersey on February 2, 2000 along with 2 other corporations. Casini's plan was to have 3 entities—a design company, a manufacturing company and a sales company. Cobra World Champion Power Boat Corp. was to be the sales company controlled by employees. Cobra World Champion Power Boat Corp. filed bankruptcy on July 6, 2001.

Top Cat Design Co.—also formed February 2, 2000. This was the design company controlled by Casini and his friends and family.

Tsunami Marine Manufacturing Corp— the third entity formed on February 2, 2000. This was the manufacturing company controlled by the employees. Tsunami Marine Manufacturing Corp. also filed bankruptcy on July 6, 2001.

Top Cat Marine Security, Inc.—incorporated approximately 2002. To design boats for the U.S. Government for coastal security.

None of the corporate bankruptcies was completely administered. Each case was dismissed for failure to file schedules, except for Marine Investors, Inc.'s second case which was dismissed for failure to cooperate with the trustee. Despite numerous discovery requests and orders in this adversary proceeding, no books and records of any of these corporations were produced. There are numerous judgments against these corporations and Peter Casini. Laura Casini, a lawyer and cousin of Peter Casini, who did some minor legal work for his businesses summed it up well, "[F]rom what I could see and from what I was told, it was like pathetic, horrible, mismanagement."

## DISCUSSION

### I. Burden of Proof

■ Although Casini is the plaintiff in this adversary proceeding to determine dischargeability, he denies any liability to Graustein. Indeed, the contract for boat repair giving rise to the dispute was between Graustein and Marine Investors, Inc., not Casini. In pretrial proceedings, the court directed that Graustein, though nominally the defendant, should proceed first to present evidence that his claim arose post petition or that his claim, if prepetition, was the kind described in 11 U.S.C. § 523(a)(2), (4) or (6). At trial, Graustein argued that Casini, as plaintiff, should be required to present his evidence first. The court rejected this argument and required the defendant, Graustein, to put his evidence in first. He did. As it turned out Graustein called Casini as a witness and offered Casini's deposition transcripts in evidence. After Graustein rested, Casini offered no evidence,[4] so the

---

4. Casini was an extremely recalcitrant litigant. Several orders compelling discovery were entered against him as well as monetary sanctions. He failed to follow the pretrial order directing him to file a joint statement of stipulated facts. Furthermore, since Casini failed to pre-mark and exchange exhibits, the court indicated he would be prohibited from introducing exhibits. As it turns out, Casini's lawyer had no exhibits to offer. In fact, Casini did not even appear for trial; however, he was reached by telephone, so he testified as Graustein's witness.

record consists solely of evidence offered by Graustein.

A creditor bears the burden of proving an exception to discharge under Section 523 of the Bankruptcy Code by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Graham*, 973 F.2d 1089, 1098–1102 (3rd Cir.1992). There is no reason to shift the burden in an adversary proceeding to determine dischargeability simply because the debtor is the plaintiff. The rules specifically provide that "a debtor or any creditor may file a complaint to obtain a determination of the dischargeability of any debt." Fed. R. Bankr.P. 4007(a). Whether the creditor is the plaintiff or defendant, the burden of proof rest on the creditor and he should present his evidence first. *See, e.g., In re Perkins*, 2000 WL 1010580 (Bankr.E.D.Pa. 2000) (noting that all exceptions to discharge are interpreted strictly against the creditor); *Kish v. Farmer*, 238 B.R. 271, 283 (Bankr.D.N.J.1999) (the creditor bears the burden of proving nondischargeability).

As to whether the debt arose prepetition or post petition (and perhaps not discharged), under these circumstances it was also appropriate to place the burden of going forward on the creditor, Graustein.[5] *In re J. Levitt, Inc.*, 37 B.R. 908 (Bankr.E.D.Pa.1984) (noting that the *creditor* bears this burden). The underlying events relating to the boat repair all occurred prepetition. Graustein should be required to demonstrate why his claim against Casini arose postpetition.

## II. Pre or Post Petition

Graustein maintains that his claim arose post petition, and therefore was not discharged, on two grounds. First, he argues that his right to assert that Casini was the alter ego of Marine Investors, Inc. did not accrue until he learned of its insolvency at Casini's deposition on July 21, 1999. Secondly, Graustein alleges that Casini has committed a continuing tort by creating then abandoning a series of entities for the same boat business all to defraud Graustein and other creditors. Thus, argues Graustein, his claim arose post petition and was not discharged.

Section 727(b) discharges the debtor from all debts that arose before the date of the petition. Debt means liability on a claim.[6] 11 U.S.C. § 101(12). Claim is broadly defined as:

**5.** Graustein cites *In re Costa*, 172 B.R. 954, 960 (Bankr.E.D.Cal.1994) for the proposition that the debtor has the burden of proving that a debt was discharged. The case is distinguishable because the debtor was seeking damages for violation of the discharge injunction, not a determination of dischargeability.

**6.** An illustrative New Jersey case, *In re Mattera* discussed the proper reach of the definition of a "claim" under the Code. 203 B.R. 565 (Bankr.D.N.J.1997). The issue was whether post petition condominium maintenance fees or assessments may be discharged by a debtor as a pre petition obligation. *Mattera* held that post petition condominium assessments are dischargeable because the *debt due* from the debtor to the aggrieved party *arose prior to the filing of the petition.*

*Id.,* at 571 (emphasis added). This result was consistent with Congress' intention to adopt the broadest possible definition of a claim, demonstrated by its amendment of § 523(a) to except condominium fees that become due after filing from discharge in 1994. H.R. Rep. 103–835, 103rd Cong. 2nd Sess. 41 (Oct. 4, 1994), U.S.Code Cong. & Admin.News 1994, 3340, 3349–50; *In re Mattera*, at 571–572, *quoting Pennsylvania Dep't. of Pub. Welfare v. Davenport*, 495 U.S. at 558, 110 S.Ct. at 2130 (noting that the Code "contemplates that all legal obligations of the debtor [no matter how remote or contingent], will be able to be dealt with in the bankruptcy case."); *In re W.R. Grace & Co.*, 281 B.R. 852 (Bankr.D.Del.2002), *quoting, Frenville*, 744 F.2d 332, at 336, *In re Bill*, 90 B.R. 651 (Bankr.D.N.J.1988) (acknowledging that

(5) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.[7]

11 U.S.C. § 101(5). Thus, a debt arose prepetition if the creditor had a right to payment prepetition.

The Third Circuit has interpreted similar language in § 362(a) which stays action on "a claim against the debtor that arose before the commencement of the case." In *Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332 (3d Cir.1984), *cert. denied* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), the court held that the crucial inquiry is when the creditor's "right to payment" arose. *Id.* at 336. *See also Jones v. Chemetron Corp.*, 212 F.3d 199 (3rd Cir. 2000) (reaffirming *Frenville's* approach in determining when a claim arises); *In re W.R. Grace & Co.*, 281 B.R. 852 (Bankr. D.Del.2002) (noting that *Frenville* is the

law of the Third Circuit). In *Frenville*, the creditor's common law right to indemnification did not arise until it had suffered a judgment against it and actually paid the judgment. The court distinguished a contractual right to indemnification where "there exists a right to payment, albeit contingent, upon the signing of the agreement." *Frenville*, 744 F.2d at 336.

Similarly, in *Jones v. Chemetron*, 212 F.3d 199 (3d Cir.2000), the plaintiffs sought damages for injuries allegedly sustained from exposure to toxic substances Chemetron deposited. The claims were filed after Chemetron's bankruptcy filing. The plaintiffs argued that the statute of limitations should be tolled because they were unable to discover their injuries prior to the bar date. The court was presented with the issue of whether the tort claims arose prepetition and were consequently dischargeable The court found that the plaintiffs had failed to present evidence to show that they satisfied their duty to investigate the cause of their injuries, and were therefore unable to benefit of the discovery rule. Applying *Frenville*, the court held that a "claim" arises for bankruptcy purposes at the same time the underlying cause of action accrues. *Id.*, at 206. The cause of action accrued when the wrongful conduct caused injury, and therefore, arose pre petition.[8]

---

"claim" is to be construed broadly); *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir.1991) (holding that though claimant was unaware of all of the sites at which debtor was a potentially responsible debtor following petition, claimant was able to ascertain the information; the fact that claimant had not gathered this information rendered its claim "contingent"). The *Mattera* approach is also in furtherance of the policy of providing a debtor a fresh start, relieving the debtor from the burden of indebtedness. *See, e.g., In re Cohen*, 185 B.R. 171, (Bankr.D.N.J.1994) aff'd 106 F.3d 52 (3d Cir.1997), aff'd 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (noting that courts construe exceptions to dis-

charge in favor of debtor in light of this policy).

7. " . . . By this broadest possible definition . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief. . . ." *Frenville*, 744 F.2d at 337, *citing*, H.R.Rep. No. 595, 95th Cong., 2d Sess 309, reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 5966.

8. *See also In re Edge*, 60 B.R. 690 (Bankr. M.D.Tenn.1986) (patient's right to payment (claim) arose at the time of debtor's alleged

Applying *Frenville* and *Chemetron* to this situation, Marine Investors' debt on the boat repair contract arose at the time of its signing in September 1995. Marine Investors had a contingent, unmatured debt to Graustein arising from the boat repair contract that arose prepetition.[9] This unmatured, contingent debt became fixed when Marine Investors breached the contract in 1996. *See, e.g., In re Retort*, 300 B.R. 411 (Bankr.W.D.Pa.2003) (right to payment arose when debtor breached the contract). Accordingly, Graustein had a right to payment from Marine Investors long before Casini filed Bankruptcy on August 19, 1997.

Pursuant to the Texas state court judgment, Casini is liable for Marine Investors' debt to Graustein as the alter ego of Marine Investors. The question is, did Graustein's right to payment from Casini as the alter ego of Marine Investors arise at a later date than Graustein's right to payment from Marine Investors?[10]

### A. Alter Ego Theory

Graustein says his claim that Casini is liable as the alter ego of Marine Investors, Inc. did not arise until he learned that Marine Investors, Inc. was insolvent on July 27, 1999, almost two years after Casini's August 1997 bankruptcy petition. In his trial brief, Graustein relies on New Jersey law as the basis for piercing the corporate veil to impose personal liability on Casini for the debts of Marine Investors, Inc. to Graustein.

"The principal is well settled in New Jersey that the doctrine of piercing the corporate veil is employed when fraud or injustice has been perpetrated." *Tsai v. Buildings by Jamie, Inc. (In re Buildings by Jamie, Inc.)*, 230 B.R. 36, 42 (Bankr.D.N.J.1998). An individual may be liable for corporate obligations if he was using the corporation as his alter ego and abusing the corporate form in order to advance his personal interests. *Id.* Veil piercing is an equitable remedy whereby the court disregards the corporate existence and holds the individual principals liable for the corporation's debts. *In re Blatstein*, 192 F.3d 88, 100 (3d Cir.1999); *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir.2002). Consequently, the individual and the corporation are treated as one for liability purposes.

Before invoking the doctrine, a plaintiff must first establish an independent basis to hold the corporation liable. *Trustees of the National Elevator Industry Pension v. Andrew Lutyk*, 332 F.3d 188, 192 (3rd Cir.2003), *quoting Peacock v. Thomas*, 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) (noting that piercing the veil is not an independent cause of action or a mechanism for imposing legal liability). Having established corporate liability for a tort or breach of contract, if the corporate defendant has insufficient assets to satisfy a prospective judgement,

---

pre petition negligence even though patient may not have discovered negligence until after filing of bankruptcy petition).

9. *See, e.g., In re Gullone*, 301 B.R. 683 (Bankr. D.N.J.2003) (*citing Schweitzer v. Consolidated Rail Corp.*, 758 F.2d at 943 (3rd Cir.1985)) (holding that the issue of whether an obligation is pre or post petition depends on when a cognizable "interest" arises, or when "a legal relationship relevant to the purported

interest from which the interest may flow" is established).

10. Interestingly, where the debtor's obligations stem from contractual liability, even a *post petition* breach is treated as pre petition liability where the contract was executed pre petition. *Chateaugay*, 87 B.R. at 779, *citing, NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

the plaintiff may then seek to pierce the veil. Therefore, an action to pierce the corporate veil is not a new cause of action, but merely a determination of whether multiple entities exist as separate entities or as mere alter egos of each other. By extension, when a cause of action accrues against the corporation, it accrues simultaneously against the individual.

 A cause of action for breach of contract accrues when the breach occurs. *In re Retort*, 300 B.R. 411, 414 (Bankr. W.D.Pa.2003). In this case, Marine Investors, Inc. breached the boat repair contract in 1995, or, at the latest, early in 1996. Thus, Graustein's cause of action for breach of contract against Marine Investors, Inc. (and by extension Casini) arose in 1995 or 1996. This was well prior to Casini's bankruptcy filing date of August 19, 1997. Piercing the corporate veil extends liability on that debt to Casini—it does not however, create a new debt. Casini's liability to Graustein for Marine Investors Inc's breach of contract arose prepetition and was therefore discharged.

## B. Discovery Rule

 Graustein argues that New Jersey law applies the discovery rule to postpone accrual of a cause of action until plaintiff discovers that there was a claim. "The discovery rule is a rule of equity that ameliorates 'the often harsh and unjust results [that] flow from a rigid and automatic adherence to a strict rule of law.'" *Grunwald v. Bronkesh*, 131 N.J. 483, 492, 621 A.2d 459, 463 (1993) (holding that statute of limitations for legal malpractice does not commence until aggrieved party knows or should know that damage is attributable to attorney's negligent advice). The discovery rule does not alter the accrual of a cause of action-it simply tolls the statute of limitations. *White v. Mattera*, 175 N.J. 158, 168, 814 A.2d 627 (2003) (noting that the rule does not "alter the happening of events or facts"). A cause of action accrues when "the right to institute and maintain a suit first arose," or more specifically, when the act or injury occurs. *Id.*, at 164, 814 A.2d 627, *quoting Rosenau v. City of New Brunswick*, 51 N.J. 130, 137, 238 A.2d 169 (1968); *In re M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir.1984) *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985) (noting that a "claim" arises for bankruptcy purposes at the same time the underlying cause of action accrues), *Montag v. Bergen Bluestone Co.*, 145 N.J.Super. 140, 144, 366 A.2d 1361 (1976) (noting that an action is viable once an "act" and resulting "injury" occurs); *Schiavo v. John F. Kennedy Hosp.*, 258 N.J.Super. 380, 609 A.2d 781 (1992), *aff'd*, 131 N.J. 400, 620 A.2d 1050 (1993) (noting that accrual occurs when a patient suffers injury from hospital's negligence). New Jersey courts have typically applied the discovery rule to delay commencement of a statute of limitations for a tort victim.[11]

 In order to take advantage of the discovery rule, a party must have exercised "due diligence" in investigating the alleged wrongdoing.[12] The "polestar" of

---

11. *See, e.g., Debiec v. Cabot Corp.*, 352 F.3d 117 (3rd Cir.2003) (beryllium exposure); *Lapka v. Porter Hayden Co.*, 162 N.J. 545, 556, 745 A.2d 525 (Sup.Ct.2000) (asbestos exposure); *Lynch v. Rubacky*, 85 N.J. 65, 424 A.2d 1169 (1981) (physician malpractice); *Fernandi v. Strully*, 35 N.J. 434, 173 A.2d 277 (1961) (hospital malpractice). *Compare with County of Morris v. Fauver*, 153 N.J. 80, 110, 707

A.2d 958 (Sup.Ct.1998) (holding that the discovery rule does not apply in most contract actions because breaches are generally obvious and detectable with any reasonable diligence).

12. *See Debiec v. Cabot Corp.*, 352 F.3d 117, 133–135 (3rd Cir.2003) (holding that the moment a cause of action accrues in a personal

the discovery rule is not the plaintiff's actual knowledge, but rather "whether the knowledge was known, or through the exercise of diligence, knowable to [the party]." *Debiec v. Cabot Corp.*, 352 F.3d 117, 129 (3rd Cir.2003). The burden of proof rests with the party claiming the benefit of the rule. *Id.*, at 129.

■ The discovery rule fashioned by the New Jersey courts to ameliorate the harsh effects of a statute of limitations on unwilling tort victims has no impact on the Bankruptcy Code's discharge of contract claims in light of Congress' broad definition of a claim. Parties to a contact know the terms of their agreement and any subsequent breach is obvious. As such, the discovery rule generally does not apply to contract actions. *Morris v. Fauver*, 153 N.J. 80, 110, 707 A.2d 958 (N.J.Sup.Ct. 1998). *See also The Reading Co. v. Philadelphia*, 155 B.R. 890 (E.D.Pa.1993) *aff'd* 107 F.3d 8 (3d Cir.1997)(*citing Radio–Keith–Orpheum*,[13] and noting that one who contracts with a debtor prior to bankruptcy cannot avoid the consequences of bankruptcy because he bargains for a legal relationship). *See also In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir.1991) (noting that the relationship between a

claimant and a debtor through an unmatured contract claim is far closer than that between future tort claimants unaware of injury and the tortfeasor); *In re Chateaugay*, 87 B.R. 779, 797 (S.D.N.Y.1988), *aff'd*, 875 F.2d 1008 (2nd Cir.1989), *rev'd on other grounds*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) ("The fact that the [creditor] may not proceed against [the debtor] on it's contingent claims until termination occurs does not distinguish pension liability from any other contingent claims that are triggered by a post-petition event. Termination alone could not convert the [creditor's] contingent pre petition claim into post petition claims.").

The cause of action accrued in this case when the injury occurred—Marine Investors' failure to perform under the contract. Graustein was well aware of the breach. Thus, no "investigation" was necessary to ascertain the wrongdoing. These parties bargained for a legal relationship during the contracting phase, and Graustein acknowledges that it would be imprudent to assume that Marine Investors would "always have sufficient liquidity to pay its debts."[14] This situation is a far cry from tort claimants who remain unaware of

---

injury case is at the moment the alleged injured parties possessed sufficient facts to put them on notice that a wrong has been committed, and that they need to investigate to determine if they were entitled to redress); *Vastano v. Algeier*, 178 N.J. 230, 837 A.2d 1081 (N.J.Sup.Ct.2003) (determining that plaintiffs' cause of action for legal malpractice accrued when they obtained their file because the essential facts were "reasonably discoverable."); *Lapka v. Porter Hayden Co.*, 162 N.J. 545, 556, 745 A.2d 525 (N.J.Sup.Ct. 2000) (imputing discovery in the context of a medical malpractice action if the plaintiff is aware of facts that would alert a reasonable person to the possibility of an actionable claim—an exact medical diagnosis is not required); *County of Morris v. Fauver*, 153 N.J. 80, 110, 707 A.2d 958 (N.J.Sup.Ct.1998) (holding that the discovery rule does not ap-

ply in most contract actions because breaches are generally obvious and detectable with any reasonable diligence).

**13.** *In re Radio–Keith–Orpheum Corp.* ("*RKO*"), 106 F.2d 22 (2d Cir.1939), *cert. denied* 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519 (1939). In *RKO*, the establishment of the pre petition legal relationship was the point at which the contingent claim arose. The post-petition default of the primary obligor did not reinstate debtor's pre petition guarantor obligation. The fact that the extent of the claim was neither liquidated nor fixed at the time the petition was filed did not alter the determination that the claim arose pre petition.

**14.** See Defendant's Brief § 2, dated November 24, 2003.

their injuries months or even years after the tortfeasor's filing. In addition, Graustein's delays in pursuing his rights against Casini suggest that his conduct was deliberate and calculated, as opposed to an innocent omission by an uninformed litigant. Applying the discovery rule to toll the statute of limitations is therefore unfitting in this case.

### C. Continuous Tort

Graustein maintains that the statute of limitations has not yet begun to run because Casini continues to engage in continuous tortious activity by setting up various fraudulent companies. Under the continuous tort doctrine, when an individual is subject to continuous tortious conduct, that statute of limitations begins to run only when the tortious conduct ceases. *Wilson v. Wal–Mart Stores*, 158 N.J. 263, 272, 729 A.2d 1006 (1999). For the following reasons, a continuous tort argument is unpersuasive in this case.

Application of the continuous tort doctrine is most appropriate where the wronged party can demonstrate a causal connection between the continuing tortious conduct and the wronged party's renewed injuries. Graustein had actual knowledge of his injury when Marine Investors, Inc. failed to perform in accordance with the contract. Graustein's exposure to Casini's alleged fraudulent activities is not creating new injuries or damages. Graustein argues that Casini continues to engage in fraudulent activities by and through the various companies he has set up, however,

Graustein does not have a cause of action for fraud for each fraudulent activity because Graustein has not suffered damages. Even if Casini set up these companies in an effort to defraud his creditors, there were no assets to divert, and therefore, no injury to the creditors. More specifically, Graustein is not experiencing separate injuries by each new company that Casini sets up. Graustein's claim is not based on a cumulative injurious effect; rather, he is unable to collect a single breach of contract judgment. A continuous tort argument is more appropriate for claims that are inherently and cumulatively wrongful, rather than discrete wrongful acts. As such, the continuing tort doctrine is not typically applied in bankruptcy or contract actions.[15] Accordingly, a continuous tort argument is inapplicable in this case.

Graustein's claim against Casini arose prepetition. There is no reason to postpone the accrual date and no evidence of a continuing tort. Consequently, Graustein's debt was discharged under § 727 unless excepted from discharge under § 523.

### III. Exception from Discharge

Understandably, Casini did not list Graustein on the schedule of creditors he filed with his petition because he never envisioned any liability to Graustein. Section 523(a)(3) excepts from discharge debts that were not properly scheduled. Generally, if an unscheduled creditor has no notice of the bankruptcy, his claim is not discharged. However, in a no asset, no

15. *See, e.g., Hall v. St. Joseph's Hosp.*, 343 N.J.Super. 88, 102, 777 A.2d 1002 (App.Div. 2001) *cert. denied*, 171 N.J. 336, 793 A.2d 715 (2002) ("The cases that most neatly fit into the continuing violation theory are those based on a hostile work environment."). *See also Mancini v. Twp. of Teaneck*, 349 N.J.Super. 527, 556, 794 A.2d 185 (App.Div.2002) (noting that the theory was created for causes of action based on anti-discrimination laws); *Jackson v. Chubb Corp.*, 45 Fed.Appx. 163 (3rd Cir.2002); *cert. denied*, 537 U.S. 1104, 123 S.Ct. 868, 154 L.Ed.2d 773 (2003) (nothing that the doctrine applies in employment actions); *Green v. Jersey City Bd. of Ed.*, 177 N.J. 434, 828 A.2d 883 (Sup.Ct.2003) (considering the doctrine in the context of employment-related harassment).

bar date chapter 7 case, the claim of an unscheduled creditor without notice will be discharged unless it is of a kind specified in § 523(a)(2), (4) or (6). *Judd v. Wolfe,* 78 F.3d 110 (3d Cir.1996), *In re Strano,* 248 B.R. 493 (Bankr.D.N.J.2000). Casini's was a no asset, no bar date chapter 7 case. Therefore, unless Graustein can prove that his claim is of a kind specified in § 523(a)(2), (4) or (6), his claim has been discharged.

### A. Fraud § 523(a)(2) [16]

 A debt obtained by fraud is excepted from discharge. Section § 523(a)(2)(A) provides:

> A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud.

As noted by the Supreme Court, "courts that have previously construed this statute routinely require intent, reliance, and materiality before applying § 523(a)(2)(A)." *Field v. Mans,* 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Courts in the Third Circuit have held that the creditor must prove that: 1) the debtor represented a fact, opinion, intention, or law; 2) the representation was false; 3) the representation was material; 4) the debtor obtained money, property, or services through the misrepresentation; 5) the debtor knew at the time that the statement was false; 6) the debtor intended the creditor to rely on the statement; 7) the creditor actually relied on the statement; 8) the reliance was justified; 9) the creditor sustained dam-

age; and 10) the damages were the proximate result of the false representation. *In re DeBaggis,* 247 B.R. 383 (Bankr.D.N.J. 1999), *In re Cohen,* 191 B.R. 599, 604 (D.N.J.1996), *aff'd sub nom.,* 106 F.3d 52 (3rd Cir.1997), *aff'd,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). Each element of the objection must be proved by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. at 287–88, 111 S.Ct. 654; *In re Reynolds,* 197 B.R. 204, 205 (Bankr.D.N.J.1996).

 A plaintiff does not have a cause of action for fraud until the plaintiff actually suffers damages, because actual damages are an element of the cause of action for fraud. *Holmin v. TRW, Inc.,* 330 N.J.Super. 30, 36, 748 A.2d 1141 (App. Div.2000); *citing Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350 (1997), *aff'd,* 167 N.J. 205, 770 A.2d 283 (2001); *Karo Marketing Corp. v. Playdrome America,* 331 N.J.Super. 430, 752 A.2d 341 (N.J.App.Div.2000) *cert. denied,* 165 N.J. 603, 762 A.2d 217 (2000) (noting that the aggrieved party must rely to his *detriment* ). Graustein has not proven that Casini set up shell companies in and effort to cause Graustein to rely to his detriment. Nor has Graustein proven that he relied on these mere shell companies. Even if Casini repeatedly set up these companies in an effort to defraud his creditors, Graustein has failed to prove that he suffered damages.[17] The proof offered by Graustein showed that Marine Investors, Inc. was insolvent on July 31, 1999. There was no proof that Marine Investors was ever solvent or that valuable assets or business were diverted from Marine Investors. The notion that Marine Investors was put

---

**16.** Graustein's initial pleading did not assert that his claim was nondischargeable due to fraud under § 523(a)(2)(A); nevertheless, the court will consider his argument.

**17.** *Cf. with Karo Marketing Corp.,* 331 N.J.Super. 430, 752 A.2d 341 (where debtor made resources otherwise available disappear and then reappear as income of new management company).

out of business by altering legal identities with the explicit purpose of preventing creditors from collecting payment is inconsistent with the facts of this case. Thus, Graustein has not met his burden by proving by a preponderance of the evidence that Casini engaged in fraud.

### B. Fiduciary Status § 523(a)(4)

11 U.S.C. § 523(a)(4) provides that an individual debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity...." Graustein asserts that when Marine Investors became insolvent, Casini, as a director, owed a fiduciary duty to its creditors with respect to its assets, which he continues to breach by changing legal identities.

The phrase "while acting in a fiduciary capacity" has been the subject of several historical Supreme Court opinions and has developed a particular meaning from the earliest days of United States bankruptcy law. Not everyone labeled a fiduciary falls within the bankruptcy law's definition of "acting in a fiduciary capacity." In the seminal case *Chapman v. Forsyth,* 43 U.S. 202, 2 How. 202, 11 L.Ed. 236 (1844), the Supreme Court determined that a factor who failed to remit the proceeds of sale of his principal's goods, although a fiduciary under the laws of agency, was not "acting in a fiduciary capacity" within the exception to discharge in the nation's second bankruptcy law, The Bankruptcy Act of 1841. The Court reasoned that the phrase "while acting in any other fiduciary capacity" was preceded in the 1841 Act by "defalcation as a public officer, or as an executor, administrator, guardian, or trustee" which gave it context. The fiduciary must be of the same character as an executor, etc. and not anyone who may have an implied fiduciary duty.

The cases enumerated, "the defalcation of a public officer," "executor," "adminis-trator," "guardian," or "trustee," are not cases of implied but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract.

*Id.,* 43 U.S. at 208.

Furthermore, the Court felt that if all fiduciaries were included in the exception to discharge it would be too broad and could be stretched to encompass most commercial relations.

If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

*Id.* at 208.

Almost fifty years later the Court revisited the phrase "while acting in any fiduciary character" from the nation's third bankruptcy law, the Bankruptcy Act of 1867. *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891). The Supreme Court affirmed a decision from the Supreme Court of Louisiana that a written trust document was not a true trust but merely a debtor-creditor contract. Echoing the concern of the Court, expressed in *Chapman v. Forsyth,* that excepting from discharge all debts of fiduciaries would be too broad, the Court wrote:

It said that the trust reposed in Briscoe was a trust simply in his "punctuality" and "integrity," the same trust which

lies at the base of every agency, and of every loan or other credit; that the fact that the trust was expressed in the instrument added nothing to its nature, force, or effect; and that if the word "trust" had not been used, it would, nevertheless, have been implied in identical measure and strength.

*Upshur v. Briscoe,* 138 U.S. at 377, 11 S.Ct. 313.

Again, nearly two generations passed when the Supreme Court addressed the phrase "while acting in a fiduciary capacity" under the Bankruptcy Act of 1898. In *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) a car dealer sold an automobile from inventory but failed to remit the proceeds to his finance company that had a lien on the car. Although the loan documents purported to make the car dealer a trustee of the collateral, Justice Cardozo writing for the Court said,

> The substance of the transaction is this, and nothing more, that the mortgagor, a debtor, has bound himself by covenant not to sell the mortgaged chattel without the mortgagee's approval. The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chose to speak of it as a trust.

*Id.* at 334, 55 S.Ct. 151.

Justice Cardozo explained, "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio.* He must have been a trustee before the wrong and without reference thereto." *Id.* at 333, 55 S.Ct. 151.

In this district Judge Stripp has succinctly summarized the development of the bankruptcy law regarding the exception to discharge for debtors acting in a fiduciary capacity as follows:

The scope of the term "fiduciary" under § 523(a)(4) is a question of federal law. *Matter of Rausch,* 49 B.R. 562, 563 (Bankr.D.N.J.1985) (citing *Matter of Angelle,* 610 F.2d 1335, 1341 (5th Cir.1980)). Analysis of state law, however, is necessary to determine when the requisite trust relationship exists. *Matter of Angelle,* 610 F.2d at 1341; *In re Librandi,* 183 B.R. 379, 382 (M.D.Pa.1995). The traditional definition of "fiduciary" involving a relationship of confidence, trust and good faith, is too broad for the purpose of bankruptcy law. *Matter of Rausch,* 49 B.R. at 564 (citing *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844); *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Matter of Angelle, supra* ). Rather, the meaning of "fiduciary" for purposes of Bankruptcy Code section 523(a)(4) is limited to instances involving express or technical trusts. *Chapman v. Forsyth,* 43 U.S. (2 How.) at 207, 11 L.Ed. at 238; *Davis v. Aetna,* 293 U.S. at 333, 55 S.Ct. at 153–54. Moreover, the trustee's duties must be independent of any contractual obligation between the parties and must be imposed prior to, rather than by virtue of, any claim of misappropriation. *Davis v. Aetna,* 293 U.S. at 333, 55 S.Ct. at 154; *Upshur v. Briscoe,* 138 U.S. at 378, 11 S.Ct. at 317, 34 L.Ed. at 936. Accordingly, implied or constructive trusts and trusts ex maleficio are not deemed to impose fiduciary relationships under the Bankruptcy Code. *Matter of Angelle,* 610 F.2d at 1339. The reason for this narrow interpretation is to promote the Bankruptcy Code's "fresh start" policy. *Id.*

*New Jersey v. Kaczynski (In re Kaczynski),* 188 B.R. 770 (Bankr.D.N.J.1995).

818

■ Whether a debtor was acting in a fiduciary capacity within the meaning of the Bankruptcy Code is a matter of federal law; however, federal courts look first to state law to see how the state treats the relationship. Under New Jersey case law directors of an insolvent corporation owe a fiduciary duty to creditors. *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir.2002) citing *AYR Composition, Inc. v. Rosenberg*, 261 N.J.Super. 495, 501, 619 A.2d 592 (App.Div.1993). That duty has been characterized as a quasi-trust relationship. *Portage Insulated Pipe Co. v. Costanzo*, 114 N.J.Super. 164, 166, 275 A.2d 452 (App.Div.1971). For state law purposes Casini in his capacity as a director owed a fiduciary duty to Graustein as a creditor of the insolvent corporation, Marine Investors, Inc.

■ Does the fiduciary duty imposed by New Jersey courts on the directors of insolvent corporations constitute "acting in a fiduciary capacity" within the meaning of § 523(a)(4) as interpreted by the Supreme Court? The reasons which lead the Court to find an agent, a borrower, and car dealer not to be acting in a fiduciary capacity suggest that a corporate director is not the type of fiduciary whose debts should be excepted from discharge. Viewing the phrase fiduciary capacity in context with executors, trustees and public officials, the quality or characteristics of the position of corporate director is more akin to the agent in *Chapman v. Forsyth* than a trustee of an express trust. Also, in terms of creating an exception to discharge that would likely sweep in too many debtors deserving a fresh start, treating a corporate director as acting in a fiduciary capacity would expose many owners of closely held companies to claims of nondischargeability by the creditors of their failed enterprises. After all, the failure of a small

business is usually accompanied by the bankruptcy of the individual owners who have staked their fortunes on the success of their business and may have guaranteed a large part of the corporate debt. To treat them as the type of fiduciary covered by § 523(a)(4) exposes them to harassment by all corporate creditors who would have the bankruptcy court second guess every decision by the managers of a declining business. As the court in *First Options of Chicago, Inc. v. Kaplan (In re Kaplan)*, 162 B.R. 684, 705 (Bankr.E.D.Pa.1993), *aff'd*, 189 B.R. 882 (E.D.Pa.1995), wrote:

[T]he difficulty with finding that the relationship of the director of a corporation to its creditors automatically gives rise to an express trust of all assets held by that corporation for purposes of § 523(a)(4) broadens the scope of that provision to embrace a debtor/creditor relationship. Such an extension of § 523(a)(4) is, in our view, a stretch of § 523(a)(4) beyond the purpose for which it was intended.

Accordingly, this court holds that Casini was not acting in a fiduciary capacity with respect to Graustein as a creditor of the insolvent corporation, Marine Investors, Inc. Thus Graustein's debt is not excepted from discharge under § 523(a)(4).

The court recognizes a substantial body of case law that treats a director of an insolvent corporation as a fiduciary under § 523(a)(4). Prominent among them is *Mercedes–Benz Credit Corp. v. Carretta (In re Carretta)*, 219 B.R. 66 (Bankr. D.N.J.1998). The facts in *Carretta* are similar to those in Casini's case. The debtor, Carretta, was accused of breach of fiduciary duty by appropriating the assets of an insolvent corporation to form a new corporation controlled by him. The debtor moved to dismiss the complaint under Fed. R. Civ. Pro. 12(b)(6) on the grounds that a director of an insolvent corporation is not

"acting in a fiduciary capacity" within the meaning of § 523(a)(4). The court surveyed all of the case law on the subject and concluded that the complaint stated a cause of action for nondischargeability.

Another decision by a bankruptcy court in this circuit held that a director of a dissolving Pennsylvania corporation was acting in a fiduciary capacity within the meaning of § 523(a)(4). *United States v. Bagel (In re Bagel)*, 1992 WL 477052 (Bankr.E.D.Pa.1992). Once again the court made an exhaustive review of the case law involving corporate fiduciaries and § 523(a)(4). The court granted summary judgment to the creditor holding that a state court jury verdict finding a breach of Pennsylvania's common law fiduciary duty collaterally estopped the debtor from challenging nondischargeability.

Furthermore, the Third Circuit has found that a director who transferred funds of an insolvent corporation to himself violated his fiduciary duty to creditors. *In re Docteroff*, 133 F.3d 210 (3d Cir.1997). Recognizing the weight of authority concluding differently, the court is constrained to determine the second element of § 523(a)(4), i.e., whether there was a defalcation while acting in a fiduciary capacity.

### C. Defalcation

■ Graustein suggests that Casini committed a defalcation by transferring valuable assets from the insolvent Marine Investors to a series of new corporations, leaving Marine Investors unable to pay anything to its creditors. The court finds as a fact that Casini did no such thing. Marine Investors failed. When it shut down all it had were a few molds of questionable value. Casini, like many entrepreneurs, still wanted to pursue his dream of designing and building boats. He started from scratch again with a new corporation. There is no proof that any of the assets of Marine Investors were diverted.

Furthermore, Graustein has no proof as to any damages he may have suffered through Casini's alleged defalcation. After all, if Casini diverted one dollar of Marine Investors' assets, that should not render Graustein's entire $250,000 judgment nondischargeable. Assuming *arguendo* that Casini was guilty of defalcation while acting in a fiduciary capacity there is no proof of the quantum of damages suffered by Graustein as a result of the defalcation.

There's an old saying, "you can't commit murder on a corpse." That applies to insolvent business entities. If Marine Investors was so far insolvent that it had no chance of paying its priority creditors, then unsecured creditors suffer no damage if the meager assets are dissipated. Graustein has no evidence to show that he would have recovered anything from Marine Investors, Inc. He has failed to prove any damages from Casini's alleged defalcation.

■ Defalcation refers to a fiduciary's withholding of funds, and applies to conduct that does not rise to the level of fraud, embezzlement, or misappropriation. 4 COLLIER ON BANKRUPTCY, P. 523.10[1][b] (15th ed. rev.2003). Nevertheless, some degree of culpability is required to qualify as a defalcation because debts arising from breach of ordinary care are normally dischargeable, and exceptions to discharge are strictly construed in favor of the debtor. *Id.* A defalcation occurs when a fiduciary fails to account for funds received in his fiduciary capacity. *In re Thomas*, 255 B.R. 648, 655 (Bankr.D.N.J.2000), *citing In re Kaczynski*, 188 B.R. 770, 778 (Bankr. D.N.J.1995).

■ While it is true that when a corporation becomes insolvent it owes a fiducia-

ry duty to creditors with respect to its assets, the creditor must still meet his burden that a breach of such duty caused damages. *Thomas, supra*, at 655, *citing, Francis v. United Jersey Bank*, 87 N.J. 15, 36, 432 A.2d 814 (1981). The cases above involved situations where the aggrieved party suffered pecuniary loss as a result of the breaches of the fiduciary relationships. Here, no such losses occurred. Marine Investors, Inc. did not have any valuable assets and was a money-losing venture. No proof exists that Marine Investors, Inc. was solvent or diverted assets away from Graustein and its other creditors. Consequently, Graustein has not suffered any pecuniary damage, and thus, a defalcation did not occur.

Due to Graustein's inability to establish a loss due to the breach of a fiduciary duty, this Court concludes that he is not entitled to relief under the fiduciary prong of § 523(a)(4).

### D. Willful Injury § 523(a)(6)

Lastly, Graustein contends that Casini's conduct constitutes willful and malicious injury because he returned the boat to Graustein in inoperable condition. He argues that his claim is therefore nondischargeable under § 523(a)(6).

Section 523 (a)(6) provides:

(a) A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(6) for willful and malicious injury by the debtor to another . . .

This exception from discharge applies only to acts done with actual intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (judgment against physician discharged because physician's conduct was negligent and reckless rather than intentional). The word "willful" indicates that nondischargeability requires a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. *Id.* at 61, 118 S.Ct. 974.

Graustein claims that the Texas state court found that Marine Investors, Inc. (and by extension Casini) converted Graustein's boat by failing to return it after stopping work under the repair contract. *Res judicata* (or claim preclusion) does not apply to dischargeability proceedings because the state court could not have considered that issue pre-bankruptcy. Collateral estoppel (or issue preclusion) does not apply to default judgments because the issue was never actually litigated. *Mattson v. Hawkins (In re Hawkins)*, 231 B.R. 222 (D.N.J.1999).

Graustein's Second Amended Petition in the Texas state action does not use the words conversion or convert. In his initial pleading in the bankruptcy court, Graustein characterized his state court causes of action as "breach of express and implied warranties, breach of contract, negligence, successor liability and piercing the corporate veil." The only sentence from the Texas state court record that remotely resembles conversion is from the Second Amended petition that reads, "Since that time the Defendant has failed and refused to return Plaintiff's boat to its rightful owner in working condition and fully repaired." A default judgment based on this one sentence can hardly be considered a binding conclusion that Casini was guilty of willful and malicious injury within the meaning of § 523(a)(6).

There is a complete absence in the record that Casini's actions were willful or deliberate. Though Graustein may have suffered distress over the failure to have possession of his boat in undamaged condi-

tion, he has not met his burden of proving that Casini maliciously intended to cause him such distress. Accordingly, the claim does not meet the requirements of § 523(a)(6).

### IV. Other Relief

 In addition to a determination of dischargeability, plaintiff/debtor Casini seeks "reasonable counsel fees, costs and expenses; sanctions and punitive damages; and, anything else that this Honorable Court deems equitable and just." Considering that Casini failed to attend the trial in person, presented no evidence on his case, failed to comply with the pretrial order, and provided no legal authority for the award of counsel fees or sanctions, there is no basis to award him any other relief than a determination of dischargeability. Furthermore, Casini disregarded his obligations to make discovery, did not comply with discovery orders, was held in contempt of court and sanctioned, then failed to pay the monetary sanctions imposed. This court deems it equitable and just to award no further relief to Mr. Casini and to remind him that the monetary sanctions must be paid, if still unsatisfied.

### CONCLUSION

Graustein had a right to payment which arose when he entered the boat repair contract with Marine Investors, Inc. in September 1995 or, at the latest, when Marine Investors, Inc. breached the contract in 1996. Since the right to payment occurred before Casini's petition (August 19, 1997), Graustein's claim arose prepetition and is dischargeable. Though Graustein was not listed in Casini's bankruptcy schedules, because Casini's chapter 7 case was a no asset, no bar date type, Graustein's debt was, nevertheless, discharged unless it is excepted from discharge be-

cause it is of a kind specified in § 523(a)(2), (4), or (6).

Casini's series of failed corporations did not defraud Graustein but were merely the product of unsuccessful entrepreneurships. Nothing of value was diverted from these corporations that could have satisfied Graustein's claim. A director of an insolvent corporation is not the type of fiduciary covered by § 523(a)(4); even if he is, Casini did not commit a defalcation because there were no valuable assets or business to preserve for creditors. Lastly, Casini did not cause willful and malicious injury to Graustein's property.

For the reasons set forth above, the Court holds that Graustein's claim arose prepetition, is not excepted from discharge under § 523(a)(2), (3), (4) or (6) and was discharged under § 727(b).